Morning everyone. We normally preside with the first case that's scheduled but there's been some kind of fire on a bus on Lakeshore Drive so we're going to change the order and we're going to go to the second case of the day which is U.S. v. Tellez, 13-2561. Ms. Winslow. Thank you, Your Honor. Good morning. Good morning, counsel. Bernardo Tellez's statement to the agents could not have been the product of a knowing, intelligent, and voluntary waiver of his Miranda rights because he was advised of his Miranda rights in a language which he neither spoke nor understood. At the motion to suppress hearing, the government failed to meet its burden of proof to establish that the waiver was voluntary. In addition, the district court's ruling that Mr. Tellez's statement was the voluntary product of a waiver was based not on the evidence that was presented by either party in this case but on the court's own determination that after a certain number of years in this country, Mr. Tellez must have developed something that the court called survival English. That conclusion is not supported by the record and we believe warrants a remand to the district court. This appeal obviously arises out of a motion to suppress a statement for Miranda violation. At the motion to suppress hearing, the district court heard testimony both from the agents that arrested Mr. Tellez and also from Mr. Tellez's landlord who indicated that she spoke with him on a daily basis and had some understanding of his command of the English language or lack of command of the English language. In addition, the district court considered statements from the Metropolitan Correctional Center where the defendant was housed that presented somewhat conflicting, but we still believe supporting for the defense, versions of whether or not Mr. Tellez spoke English. All parties agreed that his command of the English language, if there was any, was very limited. Nonetheless, in the end, the district court concluded that something that the court referred to as survival English was sufficient to understand and waive an individual's constitutional rights. Well see, initially, I think with the first agent that spoke with him, his responses were just one-word answers and I think with the second agent that questioned him, one-word answers, but then at some point he began to explain in English what was going on. I'd like to address that specifically, Your Honor. I'm glad you gave me the opportunity. In fact, I don't think we can get to the second statement because to get to the second statement we have to determine that there was a of the evidence that went into the statement made to the second officer were facts that were observed by surveilling officers earlier in the day. It's unclear from the circumstances of both the agent's testimony and from the nature of that statement whether or not, in fact, the agent just asked him questions to which the agent already knew the answer and once again we got one-word answers. I don't think there's anything in the agent's testimony that would fill out the fact that there was a conversation in English and even if we were to consider that, which as I said, I don't believe we can get there because we have to find a valid waiver first, none of the evidence that went into the later statement was something the agents didn't already know. They had observed Mr. Tejas and his movements throughout the day. He knew who he was meeting with. He knew what the addresses where they would be. All of those facts were the core of that statement so there's nothing that Mr. Tejas himself would have had to fill out in the English language in order for the agents to write that statement. It could have again been a yes or no situation and in fact Mr. Tejas throughout his questioning really just answered yes. I think one of the critical facts in this case is that after the defendant was stopped all of the agents indicated that he was very nervous. He was very, he wasn't shaking, but they indicated that he... I would guess almost anybody in that position would be a little shaky. Your Honor, I couldn't agree more. I think... I'm beginning to tremble myself. Nor have I, but I think anybody would be nervous and I think that that goes to the second point which is that the defendant was trying, as the agents indicated, to be very cooperative and one of the ways that individuals who don't speak the language are cooperative is that they answer yes. He was asked in Spanish. Is that in the record? The part about him being nervous is... That's in the record. That's in the record. The rest of it is your... The second is my assessment. Legal pushing. Analysis, yes, Judge. Yes, Your Honor. You're supposed to so it's okay. I'm just trying to do my job. But when the defendant was asked at the beginning of the interview with the Spanish-speaking English, Spanish-speaking agent, whether or not he spoke English, he was asked in Spanish. All of those questions were in Spanish. The Spanish-speaking agent is also an English-speaking agent. There's no reason that those initial questions could not have been asked in Spanish to make a more valid determination of whether he actually had a command of the English language. Instead, once interviewed briefly in Spanish, the Spanish-speaking agent made a determination that his English was sufficient based on three yes or no questions. And the calls that were recorded, the intercepted calls, they were all in Spanish, right? They were all in Spanish. I suppose, fortunately for Mr. Tejas, that's not as relevant here because he wasn't recorded on any of the cases that were charged with conspiring. We're speaking Spanish, so that is correct, as a matter of fact. Go ahead. The Miranda form that Mr. Tejas was later presented was in English and the agent admitted, I believe on cross-examination, the agent admitted that he didn't read that form to Mr. Tejas. In fact, he gave it to Mr. Tejas to read. There is nothing in the record that would support any conclusion that Mr. Tejas is literate, can read the English language, let alone the Spanish language, for that matter. But there were no advisement of rights given in Spanish. Based on the evidence that was presented at the motion to suppress, we believe that there was insufficient evidence to establish by preponderance of the evidence that Mr. Tejas could have understood the nature of his right to remain silent and the consequences of waiving that right. There's a second issue that I think was briefed and is worth consideration. When the District Court concluded that Mr. Tejas had made a valid waiver of his rights, the District Court also stated that Miranda rights are uncomplicated. They're simple and that all he really needed to understand was that he didn't have to talk and that he could have a lawyer. But in fact, that isn't all he needs to understand. He needs to be able to understand that he doesn't have a talk, that he doesn't have to speak, that his decision to remain silent cannot be used against him, that he has the right to counsel, and that if he cannot afford counsel, counsel could be appointed for him. It is more complicated than simply you don't have to talk to us. And the District Court's conclusion that his survival English would be sufficient for him to understand very basic rights is unsupported by the record in this case, and we believe that the matter should be English. Was that based, what, he was here 15 years? That's correct. 15 years and just by sort of osmosis, you hear on television, maybe he doesn't watch English television or anything, but the Miranda warnings are so common that maybe he never thought about it applying to oneself, but to understand them. It just seems that that is, you have to let them know, but if they keep answering yes, for obvious questions, then it's hard to say that he doesn't know. He didn't say no or I don't understand, or I think he'd be able to say that, wouldn't he? He would, Your Honor, however, we do have the evidence that he was particularly nervous, that he was scared, and that he was trying very hard to be cooperative. I understand that part. And I think that Mr. Tejas lives in the kind of world that a lot of immigrants live in, particularly Mr. Tejas is undocumented, where he works with all Spanish-speaking individuals, he lives with all Spanish- speaking individuals, he lives in a Spanish-speaking community. And I wanted to ask you this, there were also before the judge were these two summaries of interviews from the pretrial detention staff, and they indicated that they had spoken with him in English, and of course the court can take that into account in determining whether he understood. So what do you have to say about that? What I have to say about those is those interviews were taken after Mr. Tejas had been submersed in a more English-speaking community for a period of time. He was in a 24-hour housing situation within the Metropolitan Correctional Center. He did make some efforts to learn English, and I don't believe that those statements are entirely uncontradicted. I believe that there's some evidence in there that he still struggled with the English language even after that period of confinement. All right. Thank you, Ms. Winslow. You want to save the rest of your time? I do. Thank you, Your Honor. All right. Ms. Mecklenburg. Good morning. Sherry Mecklenburg on behalf of the United States. The District Court did not clearly err in finding that the defendant spoke English sufficiently to knowingly and intelligently waive his Miranda rights. The evidence presented to the District Court supported this finding. First, I'd like to clear up that the defendant was never given a Miranda form to simply read. Later, he was given a consent-to-search form, but his Miranda warnings were actually read to him in English. Initially, he was questioned by a Spanish-speaking officer. He answered repeatedly in English, and then when he was asked if he spoke English, he indicated that he did. He was then turned over to an English-speaking officer who asked him for each Miranda right and asked him after each Miranda right if he understood. He indicated that he did. At the end of the Miranda rights, that officer asked him if he understood all the rights, and he's indicated that he did. And then the English-speaking officer had a conversation in English with the defendant, where he had a conversation and did not answer just simply yes or no. But we wouldn't be here today if they had just conducted those initial questions and indeed continued to speak to him in English to be sure. That's true, and the evidence appears that initially they were going to question him in Spanish, but that he converted it to English when he kept responding in English. And then the Spanish-speaking supervising agent then moved on to other things, according to his testimony, and turned him over to an English-speaking agent who testified that he had no trouble conversing with the defendant in English. And counsel disputes whether or not he was asked questions and then gave more fulsome answers. I mean, her position is they knew exactly what was going on. When they asked the question, the questions were more like leading questions versus open-ended. I thought they were open-ended. Well, the evidence shows that some of the questions were open-ended. Obviously, the Miranda warnings are going to be closed questions. But then when they began to talk, among the questions, for example, that the agent asked were, what did you plan to do with the duffel bags containing the drugs? And the defendant explained that his cousin Timo, who is his co-defendant in this case, that his cousin Timo had instructed him to take the two bags back to where he lived. And then the agent asked him, well, what were you supposed to do next? And he answered that he was supposed to wait for a telephone call from Timo, and then to deliver the drugs. Another example would be when they asked him where he got the drugs, even though the agents had done surveillance and knew where they had met up with someone, the defendant said that Timo spoke with the truck driver, and then they drove to 105th and Indianapolis and met with the truck driver, and the truck driver threw the red duffel bag in the Ford van. The officers did not know that it was actually Timo who spoke with the truck driver, and the officers agents did not know who actually put the duffel bag in the van. Whether it was true or not, the defendant had a conversation about this in English with the English-speaking agent, and the agent testified uncontradicted that he had no trouble conversing, understanding these basic principles with the defendant. Now one of the other things you rely on is that pre-trial interview that he had. Now if I understood counsel correctly, she just responded that in the 24 hours he was in pre-trial detention, his English improved immeasurably. I did not, the government did not rely on that in that interview in the trial court. That was not a matter that I put before the district court. Of course they can consider it. I believe that he was interviewed shortly after being arrested, and so I don't know how his English could have changed. His own testified that she had heard him converse in English to his employer at times. Of course he conversed only in Spanish to her because she spoke only Spanish. I would say that the parties did not all agree that the defendant spoke very limited English based on the evidence that the agent testified that he had a conversation with the defendant in English, and that he did not just answer yes. Now the court found that he had a limited understanding of English. I believe the court said, the court found that he had a limited, somewhat limited understanding of English, and I believe he said that it was very... That's true of a lot of us. Well you know he, the court's finding that he had survival English was not just based on the court pulling this out of the air. The court had sat through a and found that it was a very simple concept that you, which says you don't have to answer questions, and a very simple concept that you can have a lawyer, and I think the defendant understood that. I think he understood that in English. And then on page 11 of my brief I have a black quote which I won't read to you, but that is the district court's finding, and he continuously, and the district court repeatedly says that the, he believes that the defendant understood the basic principles of the Miranda rights. And that's based on the evidence that the court heard, which was the testimony of the agents, as well as the defendant's own witness, and the submission of the defendant's request for library time at the jail. If you have no further questions, then we would No, no further questions. Oh I'm sorry, I thought you were signaling me. No. If you have no, goodbye, okay. We respectfully request that you affirm. We'll take that Ms. Macklenburg. Thank you. You don't need to stand up further if we don't have any questions. Thank you very much. All right, thank you. Ms. Winslow. Very, very briefly, I'd like to respond to Judge Williams in particular with respect to the pretrial interviews. The interviews I was referring to were interviews of Metropolitan Correctional employees, and not the pretrial services interview. Okay, MCC, then I was, but, but I knew there had been some post-arrest pretrial where they were getting, gathering information. That's right, but it was significantly past the 24 hours of his arrest. Okay. So there was a period, I would agree that 24 hours wouldn't be fast enough to pick up the English language. Well, thanks for clarifying that. Absolutely, and with respect, just very briefly in response to the government's position that he converted the conversation to English, if yes and no, answering simply yes and no, and the words for no in Spanish and English are the same in essence, is converting it to English, then I think it's a, it's a surprisingly low standard. In fact, there was no extended conversation in English while he was being interviewed by a Spanish-speaking officer. We would ask that this case be reversed and remanded. So her, but she indicated when he was asked what was going to happen to the drugs and all those things, that he actually gave more than yes or no, that he gave real answers. That interview was taken by the agents in a field setting. We don't have the benefit of recording. I would disagree. All right. All right. We understand your position. Thank you, Ms. Winslow. You were appointed. I was, Your Honor. We thank you for your vigorous representation of your client, and Ms. Macklinburg, as always, a vigorous representation, and we will take the case under advisement. Thank you, Your Honor.